**Amador Irizarry SANABRIA, Petitioner,**

v.

**UNITED STATES of America, Defendant.**

Civil No. 95–1579 (JAF).
Criminal No. 92–054.

United States District Court,
D. Puerto Rico.

Feb. 15, 1996.

Amador Sanabria, pro se.

Jose A. Quiles Espinosa, Senior Litigation Counsel, Guillermo Gil, United States Attorney, District of Puerto Rico, San Juan, PR, for Defendant.

## OPINION AND ORDER

FUSTE, District Judge.

### I.

Amador Irizarry Sanabria has petitioned this court under 28 U.S.C. § 2255 (1988) for a writ of *habeas corpus* to vacate or amend his sentence of October 26, 1992. Petitioner claims that he was incorrectly deemed to have used or carried a firearm in relation to the drug trafficking crime of which he was convicted and that, consequently, his sentence was mistakenly enhanced under 18 U.S.C. § 924(c)(1) (1988).[1] Having reviewed both the petition and pertinent case law, we grant the petition. The facts of the case are reported in *United States v. Andújar,* 49 F.3d 16 (1st Cir.1995).

### II.

Petitioner alleges that the court incorrectly deemed him to have been in possession of a firearm for purposes of section 924(c)(1) because (1) the recovered weapon was never subjected to "normal testing,"[2] and (2) defendant did not use or attempt to use the weapon in the course of the drug trafficking for which he was convicted. The petitioner admits that confidential informant Linder conditioned his participation in the conspiracy to import narcotics on receipt of a firearm with which to furnish himself personal protection. *Docket Document No. 1,* p. 2 (Defendant's brief in support of his petition) (citing Tr. 88). Defendant provided the requested firearm to confidential informant Linder with the expectation that, should it prove necessary, the weapon would be used by confidential informant Linder to protect himself in the course of the narcotics transaction.

### III.

Petitioner apparently acknowledges that he was in possession of the firearm until he gave it to confidential informant Linder, so any proof from so-called "normal testing" that petitioner had possessed the weapon is surely superfluous. Moreover, neither our review of the case law nor the petition points to any case establishing an independent, procedural right to "normal testing" such that, had the government failed to test accordingly, the Due Process Clause would render a conviction under section 924 unconstitutional.

---

1. Section 924(c)(1) states in pertinent part:

   Whoever, *during and in relation to* any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, *uses or carries* a firearm, shall, in addition to the pun- ishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, .... (Emphasis added).

2. Petitioner does not explain what he means by "normal testing," but we presume, for the sake of argument, that he means some set of scientific tests which would indicate whether the firearm was operable.

## IV.

### A. *"Use" Under Section 924(c)(1)*

Petitioner also contends that, though he had given a firearm to confidential informant Linder for use in a drug trafficking crime, petitioner had neither "used" nor "carried" the weapon as required by the statute. It had long been the rule in this Circuit that, in order for a gun to be "used" in relation to a drug trafficking offense, the gun, at least, must have facilitated or have had the potential of facilitating a drug trafficking offense. Under this test for a so-called "facilitative nexus," the mere fact that the firearm might have facilitated the drug trafficking offense by emboldening one or more of the offenders sufficed to establish "use" in relation to the drug-trafficking offense. *United States v. Eaton,* 890 F.2d 511, 512–13 (1st Cir.1989) (applying rule and citing cases). Likewise, the fact that the firearm was in the hands of a co-conspirator, not the petitioner himself, did not mean that, for purposes of section 924(c)(1), petitioner had not "used" the weapon, so long as petitioner "exercised dominion and control over the object, either directly or through others." *United States v. Ramirez-Ferrer,* 1995 WL 237041, *5 (1st Cir.1995) (citing *United States v. Garcia,* 983 F.2d 1160, 1164 (1st Cir.1993)).

On December 6, 1995, the United States Supreme Court decided *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), rejecting the "accessibility and proximity" test adopted by the Court of Appeals for the District of Columbia in *United States v. Bailey,* 36 F.3d 106 (D.C.Cir.1994). The "accessibility and proximity" test provided that, for purposes of section 924(c)(1), the firearm need only have been accessible or proximate for a defendant to have "used" the weapon to facilitate or embolden the predicate offense. *Bailey* now requires that to prove "use" for purposes of section 924(c)(1), "the Government must show active employment of the firearm" by the defendant or a conspirator. *Bailey,* —— U.S. at ——, 116 S.Ct. at 506. "Use" now includes, but is not limited to, brandishing, displaying, bartering, mentioning, or threatening with the firearm; it does not include the mere placing of a firearm at or near the site of a drug crime. *Id.* at ——, 116 S.Ct. at 508.

Given the similarity between the "accessibility and proximity" test and the "facilitative nexus" test adopted in this Circuit, we deem *Bailey* to have effected a change of law in this Circuit, rejecting important elements of the "facilitative nexus" test under which petitioner was sentenced. As a preliminary matter, then, we must decide whether to review the petition under the "facilitative nexus" test or under the rule announced in *Bailey*. *Teague v. Lane,* 489 U.S. 288, 300–01, 109 S.Ct. 1060, 1069–70, 103 L.Ed.2d 334 (1989) (before deciding general retroactivity of new rule, court should preliminarily determine retroactivity in case at issue).

### B. *Retroactivity of Bailey*

As we noted in *Lebon v. United States,* 899 F.Supp. 722, 727 (D.Mass.1995), the Supreme Court decision of *Griffith v. Kentucky,* 479 U.S. 314, 320–27, 107 S.Ct. 708, 711–15, 93 L.Ed.2d 649 (1987), stands for the proposition that new rules of criminal law should have retroactive effect upon all cases pending on direct review. As we also noted in *Lebon,* however, *Griffith* does not purport to provide the same rule for cases under collateral review. *Id.* In *Teague v. Lane,* 489 U.S. 288, 290, 109 S.Ct. 1060, 1063–64, 103 L.Ed.2d 334 (1989), the Supreme Court announced its new rule of retroactivity, patterned on a rule formulated by Justice Harlan in *Mackey v. United States,* 401 U.S. 667, 681–95, 91 S.Ct. 1171, 1174–82, 28 L.Ed.2d 388 (1971). This rule provides that a new constitutional rule of criminal procedure should not be applied retroactively to cases on collateral review unless the new rule (1) places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or (2) requires the observance of those procedures that are implicit in the concept of ordered liberty. *Teague,* 489 U.S. at 290, 109 S.Ct. at 1063–64.

Though the Court explains in *Teague* that its rule of retroactivity applies to new constitutional rules of criminal procedure, it remains unclear whether or not *Teague* also

applies to cases, like petitioner's, that involve new rules of nonconstitutional law. Moreover, *Teague* provides no clear indication of whether or not the Court intended the same rule of retroactivity that it there applied on collateral review of a final state court conviction to apply when reviewing the sentence of a federal convict. These are the issues to which we now turn.

### 1. *Application of Teague to Motions Arising Under Section 2255*

■ In his dissent to *Teague*, Justice Brennan noted that the Court did not indicate whether or not it intended that the rule it there announced would extend to claims brought by federal, as well as state prisoners. *Teague*, 489 U.S. at 327 n. 1, 109 S.Ct. at 1084 n. 1. We acknowledge that there is substantial evidence in the legislative history of section 2255 that a federal conviction or sentence is not "final" within the meaning of the statute until disposition of the *habeas* petition. *See* James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 25.6 n. 17, at 787–86 (2d ed. 1994). *See also United States v. Payne*, 894 F.Supp. 534 (D.Mass.1995) ("the difference in the nature of proceedings under sections 2254 and 2255 precludes application of *Teague* to federal prisoners"). Since *Teague* applies only to cases in which conviction has become "final", its rule of retroactivity would seem never to apply to petitions filed under section 2255. But the analysis must go further.

■ Whatever meaning Congress may have intended for the term "final", we are concerned less with the construction of the term as it appears in section 2255 as with the meaning that the Supreme Court ascribed to the term when deciding *Teague*, for it is *Teague*, not the statute, that we now interpret. And here, for once, the Supreme Court has left little ambiguity, Justice Brennan notwithstanding. In *Griffith*, from which *Teague* was later derived, the Court explained:

> By "final", we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari

elapsed or a petition for certiorari finally denied.

*Griffith*, 479 U.S. at 321 n. 6, 107 S.Ct. at 712 n. 6. We deem this language to leave little room for a special rule of retroactivity applicable only to section 2255 petitioners. And, though this language is found only in dicta, we have no reason to believe that the Court has subsequently revised its definition of the term "final" in *Teague* and its progeny.

Should there remain any doubt that the Supreme Court intended that *Teague* apply to section 2255 petitions, we have the words of Justice Harlan himself:

> I realize, of course, that state prisoners are entitled to seek release via habeas corpus under 28 U.S.C. § 2241, while federal prisoners technically utilize what is denominated a motion to vacate judgment under 28 U.S.C. § 2255. However, our cases make these remedies virtually congruent and the purpose of substituting a motion to vacate for the traditional habeas action in the federal system was simply to alter one minor jurisdictional basis for the writ. *See United States v. Hayman*, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952). As I do not propose to make any distinction, for retroactivity purposes, between state and federal prisoners seeking collateral relief, I shall refer throughout this opinion to both procedures as the writ of habeas corpus, and cases before us involving such judgments as cases here on collateral review.

*Mackey v. United States*, 401 U.S. 667, 681 n. 1, 91 S.Ct. 1171, 1174 n. 1 (1971). As we have already noted both here and in *Lebon*, 899 F.Supp. at 728, *Teague* adopts, with minor modification, the retroactivity rule employed by Justice Harlan in *Mackey*. Again, nothing in the language of *Teague*, itself, suggests that, when adopting the rule of retroactivity found in *Mackey*, the Court found it necessary either to reject or revise Justice Harlan's terminology.

■ Moreover, both logic and equity counsel that we not afford state petitioners under section 2254 less protection than we afford federal petitioners under section 2255. In *United States v. Tayman*, 885 F.Supp. 832 (E.D.Va.1995), the court noted that *Teague*

rests on both "(i) society's interest in the finality of criminal convictions, and (ii) federal and comity principles which caution against instruction on states' criminal judgments." *Id.* at 838. We agree with *Tayman* that, even in the absence of comity concerns, the need for finality is equally as great for federal convictions as for those issued by state courts. *Id.* (citing *Elortegui v. United States,* 743 F.Supp. 828, 831 (S.D.Fla.1990)).

While *Teague* does cut deeply—perhaps unwisely—into the availability of the Great Writ and has undoubtedly spawned considerable confusion in the process, we cannot see the wisdom in compounding both the inequity and confusion by limiting *Teague* along lines that offer distinction without difference. James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 25.1, at 717–22 (2d ed. 1994) (*Teague* as a source of both inequity and confusion). If we must deny state petitioners retroactivity, we should deny retroactivity to federal petitioners as well; such has been our policy and so it should remain until the Supreme Court or Congress dictates otherwise. *See, e.g., Lebon,* 899 F.Supp. 722 (D.Mass.1995) (applying *Teague* to section 2255 petition).

### 2. *Applicability of Teague to New Nonconstitutional Rules of Law*

■ While we deem the Supreme Court to have clearly indicated that the rule of retroactivity should be the same for both state and federal *habeas* petitioners, the Court has left the lower courts with only the most impressionistic indication of whether or not *Teague* should apply to new non-constitutional rules of law. While *Teague,* itself, speaks only of "new *constitutional* rules of criminal procedure," and the Supreme Court has yet to apply *Teague* in the context of a new rule of non-constitutional law, we believe that the limiting language in *Teague* and its progeny is "merely a vestige of the fact that the *Teague* analysis originated in cases involving only constitutional claims." *Tayman,* 885 F.Supp. at 832. The Supreme Court has never indicated that retroactivity depends on whether or not the new rule of law is constitutional or statutory. As noted in *Payne,* there are, of course, several instances in which the Supreme Court has explained that it determines the applicability of *Teague* by asking whether or not the Constitution requires the "new rule" for which retroactivity is sought. *See Payne,* 894 F.Supp. at 541 (citing, *inter alia, Goeke v. Branch,* —— U.S. ——, 115 S.Ct. 1275, 131 L.Ed.2d 152 (1995) (per curiam); *Caspari v. Bohlen,* —— U.S. ——, ——, 114 S.Ct. 948, 957, 127 L.Ed.2d 236 (1994)). And we do acknowledge that Justice Harlan wrote *Mackey* with only *constitutionally-dictated* rules of procedural due process in mind, Justice Harlan having contrasted these procedural laws with *constitutionally-dictated* rules of substantive due process. *Mackey,* 401 U.S. at 692, 91 S.Ct. at 1179. Yet, as we have already noted, the Supreme Court has, to date, dealt with *Teague* only on review of state court convictions. Since the Supreme Court of the United States is not in the business of announcing new, substantive, *state* law, we should, then, hardly expect to find the new rules with which the Supreme Court has dealt to involve anything but constitutionally dictated procedure.

Moreover, the concerns of finality and comity, upon which the Supreme Court based both *Teague* and *Mackey,* apply with equal force to new non-constitutional law as they do to new rules derived from the Constitution. *See Tayman,* 885 F.Supp. at 838. In fact, we should expect that, given the relative importance of new constitutionally-dictated rules of procedure, our rules of retroactivity would, if anything, require that the courts apply new rules of constitutional law with more liberal retroactivity than they would of non-constitutional law. *See Hrubec v. United States,* 734 F.Supp. 60, 65 (E.D.N.Y.1990). Of course, a policy of limiting the applicability of *Teague* to cases involving new rules of constitutional law would produce the opposite result.

Not surprisingly, then, most of the lower courts that have addressed the issue have found new statutory non-constitutional law retroactive on collateral review. *See* James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 25.1 n. 18, at 719–20 (2nd ed. 1994). In *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875,

97 L.Ed.2d 292 (1987), the Supreme Court limited the scope of the federal mail fraud statute by excluding from its reach infringements against intangible property. This new statutory, non-constitutional rule provoked petitions for collateral relief from those whom the courts had convicted for infringing upon intangible property rights. Most courts agreed that the holding of *McNally* should apply retroactively. *See, e.g., United States v. Shelton*, 848 F.2d 1485, 1488–90 (10th Cir.1988) (*en banc*); *Ingber v. Enzor*, 841 F.2d 450, 453–54 (2nd Cir.1988); *United States v. Mandel*, 862 F.2d 1067, 1074–75 (4th Cir.1988), *cert. denied*, 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989); *Magnuson v. United States*, 861 F.2d 166, 167 (7th Cir.1988); *Lomelo v. United States*, 891 F.2d 1512, 1515 n. 8 (11th Cir.1990). Unfortunately, these courts have reached their common conclusion by different routes. *See* James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure*, § 25.1, at 720 (2nd ed. 1994). Some courts deemed the case to have fallen within the first exception to *Teague*, while others concluded that *Teague* does not apply to new rules of substantive criminal law. *Id.*

The matter has come to only slightly greater resolution within this Circuit. Though only in *dicta*, the Court of Appeals for the First Circuit has intimated that *Teague* applies with equal force to cases involving new rules of non-constitutional law. In *United States v. López–Peña*, 912 F.2d 1542 (1st Cir.1989), *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991), the Court of Appeals states that,

> [f]or cases arising on collateral review after convictions have become final, a different set of considerations is implicated. In such cases, new rulings—*even those of a constitutional dimension*—are not applicable, unless the neoteric rules affect primary, private individual conduct, or are so central to an accurate determination of innocence or guilt as to constitute a "bedrock procedural element."

*Id.* at 1545 n. 3 (emphasis added). Then, in *United States v. Valladares–Tesis*, 762 F.Supp. 465 (D.P.R.1991), the district court, following *Hrubec*, concluded that *Teague*

does, in fact, apply to new rules of statutory, non-constitutional law. More recently, however, Judge Young, District of Massachusetts, has suggested that the issue remains unresolved, while noting, however, that most courts that have considered the retroactivity of the non-constitutional rule of criminal procedure announced in *Gómez v. United States*, 490 U.S. 858, 872, 109 S.Ct. 2237, 2246, 104 L.Ed.2d 923 (1989), have applied *Teague. Payne*, 894 F.Supp. at 542 n. 15.

Following the majority of courts that have addressed this issue, we now conclude that *Teague* applies to new rules of nonconstitutional law. We follow the majority, not because we perceive these other courts to have adopted a unified approach to the matter, but because we perceive these courts to have failed, as have we, to identify a good reason to distinguish between constitutional and nonconstitutional rules of law when determining retroactivity.

### 3. *Applicability of Teague to New Substantive Rules of Law*

■ Though we deem *Teague* to apply both on collateral review of federal court convictions and to new rules of non-constitutional law, we agree with *Tayman*, that *Teague* does *not* apply to new *substantive* rules of law. *Tayman*, 885 F.Supp. at 839–41. As we have already noted, Justice Harlan wrote *Mackey* with only rules of procedural due process in mind, differentiating substantive rules of due process as follows:

> New "substantive due process" rules, that is, those that place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, must in my view, be placed on a different footing. As I noted above, the writ has historically been available for attacking convictions on such grounds.

*Mackey*, 401 U.S. at 692–93, 91 S.Ct. at 1180. From this language, *Teague* fashions the first exception to its rule of retroactivity. *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073–74. As noted in *Tayman*, "the Supreme Court subsequently recognized that [this exception] properly included the remainder of the *Con-*

*stitution's* substantive guarantees." *Tayman,* 885 F.Supp. at 841 (citing *Penry v. Lynaugh,* 492 U.S. 302, 329–30, 109 S.Ct. 2934, 2952–53, 106 L.Ed.2d 256 (1989); *Saffle v. Parks,* 494 U.S. 484, 494, 110 S.Ct. 1257, 1263, 108 L.Ed.2d 415 (1990)) (emphasis added). Once we admit that this first exception to *Teague* encompasses other substantive rules of law, and we have refused to distinguish between constitutional and non-constitutional rules of law in determining retroactivity, we find ourselves compelled to apply this first exception to *Teague* to all new substantive rules of law.

While the Supreme Court has yet to apply *Teague*'s exception to a non-constitutional substantive rule of law, we note that such a construction is wholly consistent with existing Supreme Court retroactivity jurisprudence. *Tayman,* 885 F.Supp. at 841 (Supreme Court yet to apply first *Teague* exception to substantive law, but has not yet had occasion to do so). Construing Teague's first exception to exclude all rules of substantive law nicely harmonizes *Teague* with *Robinson v. Neil,* 409 U.S. 505, 93 S.Ct. 876, 35 L.Ed.2d 29 (1973); *Davis v. United States,* 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); and *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). *Tayman,* 885 F.Supp. at 839. In the pre-*Teague* case of *Robinson,* the Court explained that courts should apply new rules retroactively where the "practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial." *Robinson,* 409 U.S. at 509, 93 S.Ct. at 878. Then, in *Davis,* the Court explained that "section 2255 provides relief where an intervening judicial decision establishes that the defendant suffered conviction and punishment ... for an act that the law does not make criminal." *Davis,* 417 U.S. at 346, 94 S.Ct. at 2305. Finally, in *Johnson,* a post-*Teague* decision, the Court "recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place." *Johnson,* 457 U.S. at 550, 102 S.Ct. at 2587. In these cases and *Teague,* read together, the Supreme Court seems to say to a *habeas* petitioner:

> Though subsequently announced procedure might have affected the trial of your case, procedure is not ordinarily such that we can determine whether the outcome of your trial would have been different under our new procedures with sufficient certainty to overcome our concerns with finality and comity. However, if some substantive element of the law has changed, and we can tell with certainty from the adjudicated facts that, as a matter of law, you would not have been tried or convicted under our new rule of law, we will set aside our concerns of finality and comity to ensure that justice was done.

This approach spares the courts the unreasonable burden of having to re-try *every* case brought under the old substantive law, while simultaneously permitting the courts to release or resentence those guilty of acts that the court no longer considers criminal. This is the approach that we employ today.

#### 4. *Bailey Under Teague*

As we have already intimated, *Bailey* unquestionably announces a "new rule" for purposes of *Teague* under any of *Teague*'s various phrasings of the test for newness. *Teague* explains that "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government" or, put differently, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070. *Bailey* not only breaks new ground by redefining the term "use", but also requires that the government now show "active employment" where "accessibility and proximity" would have sufficed in the past. Moreover, neither the new rule nor its result were dictated by the law of this circuit or any other at the time that defendant's conviction became final.

We proceed, then, to determine whether, under the new rule of *Bailey,* defendant would not have been convicted for violation of section 924(c)(1). Obviously, defendant did not "use" the firearm as a weapon in any of the traditional ways mentioned in *Bailey. Bailey,* — U.S. at — , 116

S.Ct. at 508 (traditional uses of firearm). At no point did defendant fire, brandish, display, or threaten with the firearm. Nonetheless, defendant may still have used the firearm as something other than a weapon.

██ As noted in *Bailey, id.,* at ——, 116 S.Ct. at 508, and fully explicated in *Smith v. United States,* 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), active employment of a firearm as something other than a weapon may fall within the ambit of section 924(c)(1) if that use somehow furthers the drug crime. In *Smith,* the Court deemed the defendant to have "used" a firearm when he bartered it for narcotics. Of course, furnishing a firearm to a co-conspirator who has demanded a firearm for personal protection during the transaction smacks of barter, but we think that the analysis must go deeper.

██ *Bailey* is internally inconsistent unless we read the phrase "actively employ" as it appears in *Bailey* to require something less than physical manipulation, transport, or movement of the firearm; for, according to *Bailey,* merely threatening to use a weapon constitutes "use" within the meaning of section 924(c)(1). *Bailey,* —— U.S. at ——, 116 S.Ct. at 508. In essence, then, *Bailey* requires only that the defendant have actually attempted to make the firearm play some role in furtherance of the drug trafficking crime. However, the Court also explains that, simply having placed the firearm where it *could have* played a role in the crime does not constitute "use" within the meaning of the statute, even if the sole purpose of the firearm was to embolden one or more of the actors. *Id.* In sum, the same court that brought us head-scratching and bartering as forms of "use" in the expansive language of *Smith,* now tells us in the restrictive language of *Bailey* that "emboldening" is not a form of "use."

██ The problem is the following: If furnishing a weapon to a co-conspirator *upon demand* constitutes a form of barter, as would seem to be the case under the expansive language of *Smith,* then defendant would have "used" the weapon in violation of section 924(c)(1). However, if the defendant, eager to embolden the criminal enterprise, *voluntarily* furnished the same co-conspirator with the same firearm, the defendant would not have violated section 924(c)(1). Such a result obviously runs counter both to common sense and the clear intent of section 924(c)(1). We conclude, therefore, that furnishing a weapon to a co-conspirator, even upon the co-conspirator's demand, does not constitute a form of barter within the meaning of *Smith.*

██ Finally, we note that, though we fully expect the pre-*Bailey* "availability and proximity" analysis to live a second life under the "carry" prong of the section 924(c)(1), defendant's case presents no such quandary. No evidence in the record suggests that defendant "carried" the firearm within the meaning of section 924(c)(1). As a matter of fact, confidential informant Linder had already handed the firearm over to a Puerto Rico Police officer when he set sail for the vicinity of Mona Island, where, in furtherance of the conspiracy, he was to have picked up a shipment of drugs. Having, thus, cleared the last hurdle, we can clearly see that defendant would not have been convicted of violating section 924(c)(1) under the rule announced in *Bailey.*

### V.

We, thus, conclude that *Bailey* announces a new, nonconstitutional rule of *substantive* law that produces a different result under the adjudicated facts of this case from that which was dictated by prior law; therefore, we deem the new rule to fall within the first exception to *Teague.* We must, then, apply the new rule retroactively. Applying *Bailey* retroactively, we find that defendant has not violated section 924(c)(1), because he did not *actively* employ the firearm during and in relation to the drug crime; therefore, we **VACATE** defendant's conviction under section 924(c)(1) and amend his sentence accordingly.

### VI.

The court crafts a lower sentence for Amador Irizarry–Sanabria. There is no need for a new sentencing hearing. *United States v. Taylor,* 11 F.3d 149, 151 (11th Cir.1994);

*United States v. Jackson,* 923 F.2d 1494, 1496 (11th Cir.1991). Resentencing is beneficial to the defendant and the facts of the case are clearly established, not only in the presentence investigation report, but on this record and on the appellate decision. *See United States v. Andújar,* 49 F.3d 16 (1st Cir. 1995).

Pursuant to USSG § 2D1.1(c)(4), the base offense level for 1,361 kilograms of marijuana is 32. Since the defendant possessed a firearm during the commission of the offense, the base offense level is increased to 34. *See Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The defendant accepted criminal responsibility at the time of sentencing. A two-level decrease is warranted under USSG § 3E1.1(a). The adjusted base offense level is 32. The Criminal History Category is I. The guideline imprisonment range is 121 to 151 months, with a 120–month statutory mandatory minimum sentence under 21 U.S.C. § 960(b)(1)(G).

It is the judgment of this court that defendant is hereby committed to the custody of the Bureau of Prisons for imprisonment for a term of one-hundred and twenty-one (121) months as to Count One (21 U.S.C. § 963). The court finds that the imposition of a fine is not a viable alternative in this case. The term of supervised release of five (5) years as to Count One, imposed at the time of the original sentence on October 26, 1992, remains in place.

**IT IS SO ORDERED.**